OPINION OF THE COURT
Renee R. Roth, S.
*199 This uncontested application for advice and direction in connection with seven trust agreements executed on December 31, 1969 by Martin B. (the grantor) illustrates one of the new challenges that the law of trusts must address as a result of advances in biotechnology. Specifically, the novel question posed is whether, for these instruments, the terms “issue” and “descendants” include children conceived by means of in vitro fertilization with the cryopreserved semen of the grantor’s son who had died several years prior to such conception.
The relevant facts are briefly stated. Grantor (who was a life income beneficiary of the trusts) died on July 9, 2001, survived by his wife Abigail and their son Lindsay (who has two adult children), but predeceased by his son James, who died of Hodgkins lymphoma on January 13, 2001. James, however, after learning of his illness, deposited a sample of his semen at a laboratory with instructions that it be cryopreserved and that, in the event of his death, it be held subject to the directions of his wife Nancy. Although at his death James had no children, three years later Nancy underwent in vitro fertilization with his cryopreserved semen and gave birth on October 15, 2004 to a boy (James Mitchell). Almost two years later, on August 14, 2006, after using the same procedure, she gave birth to another boy (Warren). It is undisputed that these infants, although conceived after the death of James, are the products of his semen.
Although the trust instruments addressed in this proceeding are not entirely identical, for present purposes the differences among them are in all but one respect immaterial. The only relevant difference is that one is expressly governed by the law of New York while the others are governed by the law of the District of Columbia. As a practical matter, however, such difference is not material since neither jurisdiction provides any statutory authority or judicial comment on the question before the court.
All seven instruments give the trustees discretion to sprinkle principal to, and among, grantor’s “issue” during Abigail’s life. The instruments also provide that at Abigail’s death the principal is to be distributed as she directs under her special testamentary power to appoint to grantor’s “issue” or “descendants” (or to certain other “eligible” appointees). In the absence of such exercise, the principal is to be distributed to or for the benefit of “issue” surviving at the time of such disposition (James’s issue, in the case of certain trusts, and grantor’s issue, *200 in the case of certain other trusts). The trustees have brought this proceeding because under such instruments they are authorized to sprinkle principal to decedent’s “issue” and “descendants” and thus need to know whether James’s children qualify as members of such classes.
The question thus raised is whether the two infant boys are “descendants” and “issue” for purposes of such provisions although they were conceived several years after the death of James.
Although the particular question presented here arises from recent scientific advances in biotechnology, this is not the first time that the Surrogate’s Court has been called upon to consider an issue involving a child conceived through artificial means.
Over three decades ago, Surrogate Nathan R Sobel addressed one of the earliest legal problems created by the use of artificial insemination as a technique for human reproduction (Matter of Anonymous, 74 Misc 2d 99 [1973]). In that case, the petitioner sought to adopt a child that his wife had conceived, during her prior marriage, through artificial insemination with the sperm of a third-party donor (heterologous insemination). The question before Surrogate Sobel was whether the former husband had standing to object to the adoption. In the course of his analysis, the learned Surrogate predicted that artificial insemination would become increasingly common and would inevitably also complicate the legal landscape in areas other than adoption. Indeed, he specifically forecast that, as a result of such technological advances, “[legal] issues . . . will multiply [in relation to matters such as] intestate succession and will construction” (id. at 100). Surrogate Sobel noted, however, that there was at that point a dearth of statutory or decisional guidance on questions such as the one before him.
The following year New York enacted Domestic Relations Law § 73, which recognized the status of a child born to a married couple as a result of heterologous artificial insemination provided that both spouses consented in writing to the procedure to be performed by a physician. Such statute reflected the evolution of the state’s public policy toward eliminating the distinction between marital and nonmarital children in determining family rights. Thus, where a husband executes a written consent (or even in some instances where he has expressed oral consent) to artificial insemination the child is treated as his natural child for all purposes despite the absence of a biological connection between the two (see e.g. Scheinkman, Practice Com *201 mentarles, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 73, at 309-310).
Surrogate Sobel’s predictions in Anonymous proved to be prophetic. Some 30 years later, the novel issues generated by scientific developments in the area of assisted human reproduction are perplexing legislators and legal scholars (see Scott, A Look at the Rights and Entitlements of Posthumously Conceived Children: No Surefire Way to Tame the Reproductive Wild West, 52 Emory LJ 963, 995; Elliott, Tales of Parenthood from the Crypt: The Predicament of the Posthumously Conceived Child, 39 Real Prop Prob & Tr J 47, 50; Mika and Hurst, One Way to he Born? Legislative Inaction and the Posthumous Child, 79 Marq L Rev 993).
Compounding the problem, as the authors of the foregoing studies have observed, decisions and enactments from earlier times — when human reproduction was in all cases a natural and uniform process — do not fit the needs of this more complex era. These new issues, however, are being discussed and in some jurisdictions have been the subject of legislation or judicial decisions. But, as will be discussed below, neither New York nor the District of Columbia, the governing jurisdictions, has a statute directly considering the rights of post-conceived children. In this case legislative action has not kept pace with the progress of science. In the absence of binding authority, courts must turn to less immediate sources for a reflection of the public’s evolving attitude toward assisted reproduction — including statutes in other jurisdictions, model codes, scholarly discussions and Restatements of the law.
We turn first to the laws of the governing jurisdictions. At present, the right of a posthumous child to inherit in intestacy (EPTL 4-1.1 [c] [in intestacy]), or as an after-born child under a will (EPTL 5-3.2 [under a will]), is limited to a child conceived during the decedent’s lifetime. Indeed, a recent amendment to section 5-3.2 (L 2006, ch 249, eff July 26, 2006) was specifically intended to make it clear that a post-conceived child is excluded from sharing in the parent’s estate as an “after-born” (absent some provision in the will to the contrary [EPTL 5-3.2 (b)]). Such limitation was intended to ensure certainty in identifying persons interested in an estate and finality in its distribution (see Sponsor’s Mem, Bill Jacket, L 2006, ch 249). It, however, is by its terms applicable only to wills and to “after-borns” who are children of the testators themselves and not children of third parties (see Tur ano, Practice Commentaries, McKinney’s *202 Cons Laws of NY, Book 17B, EPTL 5-3.2, at 275). Moreover, the concerns related to winding up a decedent’s estate differ from those related to identifying whether a class disposition to a grantor’s issue includes a child conceived after the father’s death but before the disposition became effective.
With respect to future interests, both the District of Columbia and New York have statutes which ostensibly bear upon the status of a post-conceived child. In the District of Columbia Code Annotated, the one statutory reference to posthumous children appears in section 42-704, which in relevant part provides that “[wjhere a future estate shall be limited to heirs, or issue, or children, posthumous children shall be entitled to take in the same manner as if living at the death of their parent . . . .” New York has a very similar statute, which provides in relevant part that, “[wjhere a future estate is limited to children, distributees, heirs or issue, posthumous children are entitled to take in the same manner as if living at the death of their ancestors” (EPTL 6-5.7 [a]). In addition, EPTL 2-1.3 (a) (2) provides that a posthumous child may share as a member of a class if such child was conceived before the disposition became effective.
Each of the above statutes read literally would allow post-conceived children — who are indisputably “posthumous” — to claim benefits as biological offspring. But such statutes were enacted long before anyone anticipated that children could be conceived after the death of the biological parent. In other words, the respective legislatures presumably contemplated that such provisions would apply only to children en ventre sa mere {see e.g. Turano, Practice Commentaries, McKinney’s Cons Laws of NY, Book 17B, EPTL 6-5.7, at 176).
We turn now to the jurisdictions in which the inheritance rights of a post-conceived child have been directly addressed by the legislatures — namely Louisiana, California and Florida— and to the seven states that have adopted, in part, the Uniform Parentage Act (2000, as amended in 2002) (discussed below)— namely, Delaware, North Dakota, Oklahoma, Texas, Utah, Washington and Wyoming. Although we are concerned here with a male donor, the legislation also covers the use of a woman’s eggs (Uniform Parentage Act § 707).
In Louisiana, a post-conceived child may inherit from his or her father if the father consented in writing to his wife’s use of his semen and the child was born within three years of the father’s death. But it is noted parenthetically that the statute *203 also allows a person adversely affected to challenge paternity within one year of such child’s birth (La Rev Stat Ann § 9:391.1).
In order for a post-conceived child to inherit in the State of California, the parent must have consented in writing to the posthumous use of genetic material and designated a person to control its use. Such designee must be given written notice of the designation and the child must have been conceived within two years of decedent’s death (Cal Prob Code § 249.5).
Florida, by contrast, requires a written agreement by the couple and the treating physician for the disposition of their eggs or semen in the event of divorce or death. A post-conceived child may inherit only if the parent explicitly provided for such child under his or her will (Fla Stat Ann 742.17).
Under the Uniform Parentage Act, a man who provides semen, or consents to assisted reproduction by a woman as provided under section 704, with the intent to become a father, is the parent of the child who is born as a result (Uniform Parentage Act § 703 [2000]). Under section 704 of the Uniform Parentage Act, both the man and the woman must consent in writing to the recognition of the man as the father. The Uniform Parentage Act has also addressed the situation where the potential parent dies before the act of assisted reproduction has been performed. In such situation, decedent is the parent of the child if decedent agreed to the use of assisted reproduction after his death (Uniform Parentage Act § 707 [2000]).
On a related question, the courts of three states have held that a post-conceived child is entitled to benefits under the Social Security Act: Massachusetts (Woodward v Commissioner of Social Sec., 435 Mass 536, 760 NE2d 257 [2002]), New Jersey (In re Estate of Kolacy, 332 NJ Super 593, 753 A2d 1257 [Super Ct Ch Div 2000] [which had enacted an earlier version of the Uniform Parentage Act]), and Arizona (Gillett-Netting v Barnhart, 371 F3d 593 [9th Cir 2004]). All three courts concluded that post-conceived children qualified for such benefits.
As can clearly be seen from all the above, the legislatures and the courts have tried to balance competing interests. On the one hand, certainty and finality are critical to the public interests in the orderly administration of estates. On the other hand, the human desire to have children, albeit by biotechnology, deserves respect, as do the rights of the children born as a result of such scientific advances. To achieve such balance, the statutes, for example, require written consent to the use of genetic material after death and establish a cutoff date by which the child must *204 be conceived. It is noted parenthetically that in this regard an affidavit has been submitted here stating that all of James’s cryopreserved sperm has been destroyed, thereby closing the class of his children.
Finally, we turn to the instruments presently before the court. Although it cannot be said that in 1969 the grantor contemplated that his “issue” or “descendants” would include children who were conceived after his son’s death, the absence of specific intent should not necessarily preclude a determination that such children are members of the .class of issue. Indeed, it is noted that the Restatement (Third) of Property suggests that
“[u]nless the language or circumstances indicate that the transferor had a different intention, a child of assisted reproduction [be] treated for class-gift purposes as a child of a person who consented to function as a parent to the child and who functioned in that capacity or was prevented from doing so by an event such as death or incapacity” (Restatement [Third] of Property [Wills and Other Donative Transfers] § 14.8 [Tentative Draft No. 4] [2004]).
The rationale of the Restatement, Matter of Anonymous and section 73 of the Domestic Relations Law should be applied here, namely, if an individual considers a child to be his or her own, society through its laws should do so as well. It is noted that a similar rationale was endorsed by our state’s highest Court with respect to the beneficial interests of adopted children (Matter of Park, 15 NY2d 413 [1965]). Accordingly, in the instant case, these post-conceived infants should be treated as part of their father’s family for all purposes. Simply put, where a governing instrument is silent, children born of this new biotechnology with the consent of their parent are entitled to the same rights “for all purposes as those of a natural child” (id. at 418).
Although James probably assumed that any children born as a result of the use of his preserved semen would share in his family’s trusts, his intention is not controlling here. For purposes of determining the beneficiaries of these trusts, the controlling factor is the grantor’s intent as gleaned from a reading of the trust agreements (see, Matter of Fabbri, 2 NY2d 236 [1957]; Matter of Larkin, 9 NY2d 88 [1961]; Jewett v Graham, 24 F2d 257 [1928]; O’Connell v Riggs Natl. Bank of Washington, D.C., 475 A2d 405 [D.C. 1984]). Such instruments provide that, *205 upon the death of the grantor’s wife, the trust fund would benefit his sons and their families equally. In view of such overall dispositive scheme, a sympathetic reading of these instruments warrants the conclusion that the grantor intended all members of his bloodline to receive their share.
Based upon all of the foregoing, it is concluded that James Mitchell and Warren are “issue” and “descendants” for all purposes of these trusts.
As can be seen from all of the above, there is a need for comprehensive legislation to resolve the issues raised by advances in biotechnology. Accordingly, copies of this decision are being sent to the respective chairs of the Judiciary Committees of the New York State Senate and Assembly.